UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -x
                                      :
UNITED STATES OF AMERICA
                                      :
          - against -
                                      :     05 Cr. 393 (DC)
DAVID FINNERTY,
                                      :
               Defendant.
                                      :
- - - - - - - - - - - - - - - - - -x        **MEMORANDUM DECISION**
                                      :
UNITED STATES OF AMERICA
                                      :
          - against -
                                      :     05 Cr. 397 (DC)
THOMAS J. MURPHY, JR.,
                                      :
               Defendant.
                                      :
- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**  (see last page)

**CHIN, D.J.**

```
┌────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #: _____          │
│ DATE FILED: 10/2/06             │
└────────────────────────────────┘
```

          Defendants David Finnerty and Thomas Murphy, Jr., move
to dismiss the Indictments against them, arguing that the facts
as alleged in the Indictments do not, as a matter of law, make
out a violation of 15 U.S.C. § 78j(b) ("Section 10(b)") and Rule
10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  They
further argue that the Indictments should be dismissed because
due process prohibits criminal prosecution of the alleged
conduct.

          In the alternative, defendants move to strike certain
language from the Indictments, and also move to inspect the
instructions given by the prosecution to the grand jury.  For the
following reasons, the motions are granted in part and denied in
part.

**BACKGROUND**

The facts, as alleged in the Indictments, 05 Cr. 393 and 05 Cr. 397, are as follows:

Finnerty and Murphy were employed by Fleet Specialist, Inc., as New York Stock Exchange ("NYSE") specialists from about 1996 and 1993, respectively, and during all times relevant to the Indictments. (Finnerty Indict. ¶ 2; Murphy Indict. ¶ 2).[1] With limited exceptions, purchases and sales of securities on the NYSE had to be executed through a specialist who worked on the floor of the exchange. (Finnerty Indict. ¶ 3; Murphy Indict. ¶ 3). To effectuate purchases and sales of particular securities, buyers and sellers had to first present their bids to buy, or offers to sell, to the specialist assigned to that security. (Id.).

Orders to purchase or sell could be presented to a specialist in one of two ways. First, the order could be conveyed orally by a floor broker on the floor of the exchange at the specialist's post. (Id.). Second, an order could be transmitted to the specialist electronically using the NYSE's "Super Designated Order Turnaround System." Orders transmitted this way would appear on a computer screen that was referred to as the "display book." (Id.).

After receiving the order, a specialist could fill it in one of two ways. A specialist was generally required by rules

---

[1]    A superseding Indictment was filed by the Government on August 21, 2006 with respect to David Finnerty. For the most part, the substance of the charges remains the same.

of the Securities and Exchange Commission ("SEC") and the NYSE to match any open buy orders from one investor with any open sell orders from another investor. (Finnerty Indict. ¶ 4; Murphy Indict. ¶ 4). These are referred to as "agency" or "broker" orders because the specialist is simply acting as an agent who matches orders of willing buyers and sellers. (Id.). In certain limited circumstances, however, specialists were permitted to execute trades on a "principal" or "dealer" basis, when required to do so to maintain a fair and orderly market. (Finnerty Indict. ¶ 5; Murphy Indict. ¶ 5). For example, if there were no matching buy and sell orders in a given price range at a given time, specialists were authorized to execute a purchase or sale by selling stock from the specialist's proprietary account, or by buying stock and holding it in that account. (Id.).

In addition to executing purchase and sale orders, specialists were responsible for reporting to the public the prices at which stocks were being bought and sold. (Finnerty Indict. ¶ 6; Murphy Indict. ¶ 6). Because of their position, specialists had access to certain material information -- such as advance knowledge of the price parameters of all open orders -- and accordingly were subject to certain rules and obligations to prevent them from taking unfair advantage of investors. (Id.). Pursuant to NYSE Rule 104, specialists were under an affirmative obligation to buy or sell stock on a principal or dealer basis when necessary to maintain a "fair and orderly" market, e.g., to minimize any actual or anticipated short-term imbalance between

supply and demand.  (Finnerty Indict. ¶ 8; Murphy Indict. ¶ 8).
Similarly, specialists were obliged to refrain from purchasing or
selling securities on a principal or dealer basis when not
necessary to maintain a fair and orderly market.  (Finnerty
Indict. ¶ 9; Murphy Indict. ¶ 9).  This negative obligation
generally precluded specialists from executing trades on a
principal or dealer basis when there were matching public orders
to buy and sell.  (Id.).  In other words, specialists were
prohibited from "trading ahead" or "interpositioning" -- trading
on their own accounts ahead of or between existing investor
orders.[2]  (Id.).

The Indictments allege that Finnerty and Murphy engaged
in schemes of trading ahead and interpositioning that resulted in
purchasing and selling securities for their proprietary accounts
at advantageous prices, to the detriment of the investing public.
Because their compensation was based in part on the profitability
of their proprietary accounts, each stood to benefit financially
from the alleged scheme.  (Finnerty Indict. ¶ 15; Murphy Indict.
¶ 15).  Finnerty is alleged to have engaged in approximately
40,000 instances of interpositioning and trading ahead, and

---

[2]      "Trading ahead" occurs when a specialist trades on his
own proprietary account ahead of and instead of matching existing
buy and sell orders, thus securing an advantageous price for his
own account.  "Interpositioning" is when the specialist trades on
his proprietary account between orders; i.e., instead of matching
a suitable buy and sell order, he fulfills the sell order by
purchasing for his own account, then fulfills the buy order by
selling from his account, with the objective being to make a
profit based on a discrepancy between the sale prices.  (See
Finnerty Indict. ¶¶ 12-13; Murphy Indict. ¶¶ 12-13).

Murphy more than 9,000.  (Finnerty Indict. ¶ 16; Murphy Indict. ¶ 16).  The Indictments allege that this conduct violated Section 10(b).

## DISCUSSION

I discuss the three motions before Court: (a) the motion to dismiss the Indictments, (b) the motion to strike certain allegations from the Indictments, and (c) the motion to inspect the grand jury instructions.

## A.   Motion to Dismiss

Defendants move to dismiss the Indictments, arguing, inter alia, that (1) the facts as alleged do not state an offense of securities fraud in violation of Section 10(b) and Rule 10b-5; and (2) due process prohibits criminal prosecution of this conduct.  I discuss the arguments in turn.

### 1.   Section 10(b) and Rule 10b-5

#### a.   Applicable Law

Section 10(b) forbids (1) the "use or employ[ment] . . . [of] any . . . manipulative or deceptive device," (2) "in connection with the purchase or sale of any security," (3) in contravention of" Securities and Exchange Commission ("SEC") "rules and regulations."  15 U.S.C. § 78j(b); see also Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341 (2005). Section 10(b) seeks "to prevent fraud, whether it is 'a garden type variety of fraud, or present[s] a unique form of deception. Novel or atypical methods should not provide immunity from the

securities laws.'"  United States v. Russo, 74 F.3d 1383, 1390 (2d Cir. 1996); see also Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930, 943 (2d Cir. 1984) ("The purpose of § 10(b) and Rule 10b-5 is to protect persons who are deceived in securities transactions.").  Thus, the statute should be construed "'not technically and restrictively, but flexibly to effectuate its remedial purposes.'"  SEC v. Zandford, 535 U.S. 813, 819 (2002) (quoting Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 151 (1972)).

SEC Rule 10b-5, which was promulgated pursuant to Section 10(b), contains three parts, and makes it unlawful:

> (a) to employ any device, scheme, or artifice to defraud,
>
> (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or
>
> (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Subsections (a), (b), and (c), however, are disjunctive, and thus, the Government need only prove a violation of one of the subsections to obtain a conviction under the statute.  See In re Alstom SA Sec. Litig., 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005).

Because the vast majority of Rule 10b-5 cases involve false or misleading statements, the law with respect to subsections (a) and (c) is not very refined.  <u>In re Parmalat Sec. Litig.</u>, 376 F. Supp. 2d 472, 497 (S.D.N.Y. 2005).  Thus, most cases do "not focus on the reach of 'deceptive device or contrivance' (the Section 10(b) language) or, for that matter, the Rule 10b-5 language of 'employ[ing] any device, scheme, or artifice to defraud' or 'engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.'"  <u>Id.</u>

Nonetheless, "the language of Section 10(b) and subsections (a) and (c) is quite broad," and thus, "the Supreme Court has emphasized repeatedly that Section 10(b) should be construed . . . flexibly to effectuate its remedial purposes." <u>Id.</u> at 501 (internal quotations and citation omitted).  Moreover, the scope of prohibited conduct under subsections (a) and (c) is quite expansive.  <u>See</u> <u>In re Alstom</u>, 406 F. Supp. 2d at 474 n.37 ("subsections (a) and (c) of Rule 10b-5 encompass a wide range of activities and are not limited to the prohibition of market manipulation"); <u>In re Global Crossing, Ltd. Sec. Litig.</u>, 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004) ("subsections (a) and (c) encompass much more than illegal trading activity: they encompass the use of '<u>any</u> device, scheme or artifice,' or '<u>any</u> act, practice, or course of business' used to perpetuate a fraud on investors") (emphasis in original).

-7-

b.  **Application**

Recently, in <u>United States v. Bongiorno</u>, No. 05 Cr. 390 (SHS), 2006 WL 1140864 (S.D.N.Y. May 1, 2006), Judge Stein of this Court addressed the identical issue before us today -- i.e., whether allegations that specialists traded ahead and interpositioned stated a securities fraud offense as a matter of law.  I conclude, as did Judge Stein, that the allegations can stand based on subsections (a) and (c) of Rule 10b-5, but are insufficient as a matter of law to the extent they rely on subsection (b).  I address subsections (a) and (c) together, and then turn to subsection (b).

i.  **Scheme to Defraud and Course of Business that Operates as a Fraud -- 10b-5(a) & (c)**

Here, the Indictment alleges that defendants' acts of trading ahead and interpositioning were schemes and/or devices to defraud in violation of subsection (a), as well as a course of business operating as a fraud in violation of subsection (c). (Finnerty Ind. ¶ 11, Murphy Ind. ¶ 11).  According to the Government, defendants used their unique position -- including their exclusive ability to determine the price of each trade -- to make a profit for themselves at the expense of the public. (Def. Br. at 11).

These allegations, if proven, would indeed be violations of subsections (a) and (c).  By taking positions as specialists, defendants were required -- under the rules of the NYSE -- to match orders and to place the interests of their

-8-

public customers above their own.  Rather than abide by these rules, defendants allegedly made a profit for themselves, and subordinated the interests of the trading public below their own. Accordingly, this scheme or course of business worked to deceive the trading public, as investors believed that defendants were working to match orders, first and foremost, and that defendants traded for their own proprietary accounts <u>only</u> to maintain a fair and orderly market.  If proven, then, these acts of trading ahead and interpositioning would constitute a violation of subsections (a) and (c).

Defendants, however, argue that these allegations are insufficient as a matter of law because: (1) subsections (a) and (c) only prohibit market manipulation or deceptive schemes that artificially affect the market price of securities, and here, the Government alleges neither (Def. Br. at 11-12); and (2) the acts of trading ahead and interpositioning were conducted openly on the NYSE floor, and thus, were not deceptive (<u>id.</u> at 11-12).

Defendants' assertions are incorrect.  First, as Judge Stein noted in <u>Bongiorno</u>, and as defendants themselves acknowledge, subsections (a) and (c) are not limited to schemes involving market manipulation.  <u>Bongiorno</u>, 2006 WL 1140864, at *6 (interpreting subsections (a) and (c) as encompassing a wide range of activities that involve either manipulation <u>or</u> deception).  (<u>See</u> Def. Br. at 11).

Moreover, defendants' argument that the claim must include allegations that the conduct artificially affected the

-9-

market price is incorrect.  For this proposition, defendants rely on In re Global Crossing and In re Parmalat.  (Def. Br. at 12). A fair reading of both In re Global Crossing and In re Parmalat, however, shows that their discussion of whether the conduct artificially affected market prices was directly related to whether the conduct had a nexus to the securities markets -- and not, as defendants argue, a requirement imposed on claims pursuant to subsections (a) and (c).  See In re Global Crossing, 322 F. Supp. 2d at 336-37 (finding that although plaintiffs' allegations of improper accounting practices did not directly involve trading of securities, alleged conduct was nevertheless a scheme in connection with securities markets because it affected prices); In re Parmalat, 376 F. Supp. 2d at 505-06 (discussing whether alleged conduct distorted market prices because one defendant argued that its conduct was not in connection with purchase or sale of securities).

Thus, whether the alleged conduct artificially affects market prices is not -- as defendants contend -- a requirement for a Rule 10b-5(a) and (c) claim.  One need only show that the conduct artificially affects market prices if there is a question about whether the alleged conduct has a nexus to the securities market.  Here, it is not necessary for the Government to set forth an allegation that those acts "artificially affected market prices" because allegations of trading ahead and interpositioning are, by their very nature, connected to the purchase and sale of securities.

Next, defendants' contention that trading ahead and interpositioning are not deceptive because they were legitimate transactions that took place openly on the NYSE floor is also rejected.  According to defendants, "[t]he prices of all executions were recorded and published.  There was neither concealment nor disguise.  These transactions were precisely 'what they appeared to be.'"  (Def. Br. at 13).

Defendants' definition of "deceptive" in the securities fraud context, however, would limit the term to only sham transactions.  That definition of "deceptive" would unjustifiably curtail its meaning.  As Judge Stein noted in Bongiorno, "[a]ffording the term its proper -- and fully inclusive -- meaning, a 'deceptive' act is one which 'tend[s] to deceive' or 'ha[s] power to mislead.' . . . . By allegedly taking positions as specialists who are required by NYSE rules to match customer orders whenever possible and instead trading for their own accounts to profit at the expense of existing public orders, defendants can properly be found to have tended to deprive their public customers through fraud or stealth." Bongiorno, 2006 WL 1140864, at *7.

Simply because these securities transactions were being recorded on the books does not remove them from the realm of deception.  If the allegations are true, it is apparent that the customers were being misled into believing that their orders were being matched, and that their interests were being placed above defendants' interests.  Indeed, contrary to defendants' argument,

-11-

the fact that the orders were publicly executed and recorded on the books arguably makes these acts even more deceptive, as the perception was given that defendants were performing their duties as directed by the NYSE and SEC rules.  That this may be a more "unique form of deception" as opposed to the "garden type variety" does not make it immune from securities laws.  <u>Russo</u>, 74 F.3d at 1390.

In short, the Government's allegations against defendants fall well within the ambit of subsections (a) and (c).  As noted, these two subsections "encompass the use of '<u>any</u> device, scheme or artifice,' or '<u>any</u> act, practice, or course of business' used to perpetuate a fraud on investors."  <u>In re Global Crossing</u>, 322 F. Supp. 2d at 336 (emphasis in original).  Defendants' attempt to give a narrow construction of the two subsections runs directly counter to the Supreme Court's mandate that Section 10(b) and Rule 10b-5 be construed "'not technically and restrictively, but flexibly to effectuate its remedial purposes.'"  <u>Zandford</u>, 535 U.S. at 819.  Accordingly, the charges in the Indictment based on subsections (a) and (c) state a securities fraud violation as a matter of law.

### ii.  <u>Material Mistatements or Omissions -- 10b-5(b)</u>

The Government alleges that defendants, as specialists, owed a fiduciary duty to hold the interests of their public customers above their own.  (Government's Memorandum of Law in Opposition to Defendants' Pretrial Motions ("Gov. Br.") at 14-

17).  Accordingly, the Government asserts that defendants'
failure to disclose their violation of that fiduciary duty was a
material omission in contravention of subsection (b).  (Gov. Br.
at 11, 17).

Defendants argue that no such duty exists, but that
even if such a duty did exist, the failure to disclose that they
were violating such a duty is insufficient to make out a claim of
securities fraud.  (Def. Br. at 6-10).

Assuming that the Government is correct, and that
defendants do owe a fiduciary duty to place the public customers'
interests above their own, see Market Street Ltd. Partners v.
Englander Capital Corp., No. 92 CIV. 7434 (LMM), 1993 WL 212817,
at *9 (S.D.N.Y. June 14, 1993) (finding that "[t]he specialist
has fiduciary obligations closely resembling, if not identical
to, those of a broker"), the Indictments nevertheless do not
state a claim under subsection (b) because they do not identify:
(1) any statements that were misleading, or (2) any statements
that were made misleading by defendants' omissions.  See
Bongiorno, 2006 WL 1140864, at *8-9.

In a letter dated January 6, 2006, the Government
argues that "[a]lthough there are no false statements that could
be articulated in a bill of particulars, the Indictments do
allege that the defendants failed to disclose (or omitted)
material facts to customers." (Hafetz Dec. Ex. C).  The failure
to disclose material facts, however, is insufficient to make out
a subsection (b) claim unless the Government can point to

-13-

statements that were made misleading by the omitted facts.  See Bongiorno, 2006 WL 1140864, at *8.

In Bongiorno, Judge Stein properly pointed out that subsection (b) "prohibits only those omissions of material fact that 'make the statements made, in the light of the circumstances under which they were made, not misleading.'  The rule's plain language thus makes it clear that liability for an omission pursuant to subsection (b) requires a statement to have been made."  Id. at *8 (citing Chiarella v. United States, 445 U.S. 222, 225 n.5 (1980)).  The Government therefore cannot prevail on its subsection (b) claim unless it can identify such a statement. It is unable to do so.

Notwithstanding its inability to identify a statement, the Government contends that Bongiorno is incorrect because there is a line of Second Circuit cases that allows for omission liability based on implied misrepresentations.  (Gov. Br. at 20). No express statements are required in those circumstances for liability under subsection (b).  For this proposition, the Government primarily relies on a line of cases that found an implied duty to disclose excessive markups when selling securities.  See Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc., 412 F.3d 103, 111 (2d Cir. 2005); Ganino v. Citizens Utils. Co., 228 F.3d 154, 163 (2d Cir. 2000); Grandon v. Merrill Lynch & Co., Inc., 147 F.3d 184, 192 (2d Cir. 1998); Charles Hughes & Co. v. SEC, 139 F.2d 434, 436-37 (2d Cir. 1943).

Those cases, however, involve situations that are different than the one that exists here.  In the excessive markup cases, the securities dealer solicits customers by actively holding himself out as someone who is representing the best interests of the customer.  See, e.g., Charles Hughes & Co., 139 F.2d at 436 ("An over-the-counter firm which actively solicits customers and then sells them securities at prices [] far above the market . . . must be deemed to commit a fraud.") (emphasis added).  In sharp contrast, specialists do not actively solicit customers, and unlike securities dealers, do not "hang[] out [their] professional shingle."  See Grandon, 147 F.3d at 192. Specialists do not impliedly represent themselves the way that securities dealers in excessive markup cases do.  As the situations are quite distinct, the Government's interpretation of subsection (b) is unpersuasive.

Significantly, the Government's implied representation theory for omission liability would also render the text of subsection (b) meaningless.  The part that says an omission is prohibited if it "make[s] the statements made, in the light of the circumstances under which they were made, not misleading" would be superfluous.  See 17 C.F.R. § 240.10b-5(b).  As the Second Circuit has noted, the Supreme Court has strictly adhered to the text of § 10(b) in securities fraud cases.  See Wright v. Ernst & Young LLP, 152 F.3d 169, 174 (2d Cir. 1998).  Here, abiding by the text of subsection (b), I conclude that the Government is required to articulate the statements that the

material omissions have caused to be misleading.  Thus, because
the Government is unable to articulate any such statements, the
charges in the Indictment that are based on subsection (b) are
dismissed.

### 2.  **Due Process & Rule of Lenity**

Defendants further move to dismiss the Indictments,
arguing that even if the alleged conduct could lead to civil
liability, it cannot lead to criminal prosecution because of due
process concerns.  First, they assert that the current cases are
"based on a theory that has never been prosecuted as a crime,"
and thus, defendants were never given fair notice that their
conduct could be considered criminal.  (Def. Br. at 14-18).
Second, defendants argue that criminal laws should be strictly
construed, and that any ambiguity in the scope or language of the
statute should be resolved in favor of lenity -- and against
criminal prosecution.  (Id. at 18-22).  Neither argument is
persuasive.

Here, it is quite clear that defendants were on notice
that both trading ahead and interpositioning were only to be
allowed "to maintain a fair and orderly market," and that at all
other times, their primary duty was to match orders.  (Finnerty
Ind. ¶¶ 8-9; Murphy Ind. ¶¶ 8-9).  By accepting their positions
as NYSE specialists, defendants were, without question, on notice
that trading ahead and interpositioning -- when not necessary to
maintain a fair and orderly market -- constituted fraudulent
behavior in connection with the purchase or sale of securities.

-16-

Thus, even if trading ahead and interpositioning were not previously prosecuted, it is wholly within the ambit of Section 10(b) and Rule 10b-5, as "[n]ovel or atypical methods should not provide immunity from the securities laws." <u>Russo</u>, 74 F.3d at 1390.

Second, the rule of lenity is of no avail to defendants because neither the scope nor the text of the statute is ambiguous.  <u>See</u> <u>Chapman v. United States</u>, 500 U.S. 453, 463 (1991) ("The rule of lenity . . . is not applicable unless there is a grievous ambiguity or uncertainty in the language and structure of the Act. . . . ") (internal quotations and citations omitted).

With respect to the scope of the statute, "[t]he Supreme Court has interpreted Section 10(b) and Rule 10b-5 expansively in accordance with congressional intent to minimize fraud in securities trading." <u>Russo</u>, 74 F.3d at 1390.  The "proscriptions, by statute and rule, are broad and . . . are obviously meant to be inclusive." <u>Affiliated Ute Citizens of Utah</u>, 406 U.S. at 151.  Hence, there is no ambiguity as to the breadth of either Section 10(b) or Rule 10b-5.

As for the text of the statute, all of the terms and phrases in question, "false and misleading," "untrue," "manipulative and deceptive devices," and "device, scheme or artifice to defraud" -- are commonly used, and have commonly accepted meanings.  <u>See, e.g.</u>, <u>United States v. Strauss</u>, 999 F.2d

692, 698 (2d Cir. 1993); <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 197-99 & n.19-21 (1976).

Defendants, however, continue to argue that they did not have fair notice that the alleged conduct could be criminally prosecuted because the NYSE has only characterized trading ahead and interpositioning as minor violations.  (Def. Br. at 16-18). But as Judge Stein correctly points out in <u>Bongiorno</u>, the NYSE's more lenient enforcement of the alleged conduct "cannot preclude prosecution for conduct that falls within the ambit of the statute." <u>Bongiorno</u>, 2006 WL 1140864, at *9.  Moreover, the same is true with defendants' argument that the NYSE has not defined the alleged conduct as fraudulent.  (Def. Br. at 16).  How the NYSE defines conduct also does not preclude prosecution if that alleged conduct falls within the ambit of the statute.

Accordingly, defendants' motion to dismiss based on due process concerns is denied.

**B.   <u>Motion to Strike</u>**

Defendants move to strike ¶ 16 from both the Finnerty and Murphy Indictments, arguing that references to the approximately 41,200 and 9,700 instances of trading ahead and interpositioning are overly prejudicial and irrelevant.  The Government responds that it will prove the charges in the Indictments, and that there is no basis for striking the relevant allegations.  Defendants' motion to strike the purported surplusage from the Indictment is denied, as the number of

violative trades in the Indictment is relevant and not overly prejudicial.

"Motions to strike surplusage from an indictment will be granted only where the challenged allegations are 'not relevant to the crime charged and are inflammatory and prejudicial.'" United States v. Hernandez, 85 F.3d 1023, 1030 (2d Cir. 1996) (citations omitted). This is an "exacting standard," United States v. Scarpa, 913 F.2d 993, 1013 (2d Cir. 1990), "and only rarely has surplusage been ordered stricken," 1 Charles Alan Wright, Federal Practice & Procedure Criminal § 127, at 426 (3d ed. 1982).

First, the number of violative trades in the Indictment is plainly relevant to the charges of security fraud. It is relevant to showing how often defendants engaged in such conduct, and may also be relevant to showing intent at trial.

Second, reference to the number of violative trades is not overly prejudicial. Defendants argue that the Government will not be able to prove that each defendant personally participated in the 41,200 and 9,700 trades. (Def. Br. at 29). Merely because defendants believe that the Government will not be able to prove personal participation by defendants does not mean that references to them should be stricken. The Government still has the burden of showing that defendants were involved in those instances of trading ahead and interpositioning. Defendants, of course, are free to move for a judgment of acquittal at trial if the Government does not satisfy its burden of proof. Thus,

-19-

contrary to defendants' contention, the burden is not being shifted to them to show that they were not involved in those trades.

Accordingly, defendants' motion to strike ¶ 16 from the Finnerty and Murphy Indictments is denied.

## C.   **Motion to Inspect**

Defendants move to inspect the legal instructions given to the grand jury to determine whether the grand jury was properly instructed.  (Def. Br. at 37).  In the alternative, defendants request that the Court review the instructions in camera for the same purposes.  (Id. at 39).  Defendants' requests are denied, as there is no evidence that the grand jury was misled in any way.

Defendants arguments are two-fold: First, they argue that this is a complicated securities fraud case, and thus, the grand jury should have received legal instructions, rather than simply having the statute read to it.  (Id. at 37-38).  Second, they argue that the Government recently filed superseding Indictments that referenced the existence of a fiduciary relationship between specialists and the trading public -- and that this omission in the original Indictments is evidence that the instructions were likely deficient or misleading.  (Id.).  Neither argument is sufficient.

First, prosecutors are generally not required to provide legal instructions to the grand jury.  See United States v. Lopez-Lopez, 282 F.3d 1, 9 (1st Cir. 2002) ("under federal law

the prosecutor is not obligated to provide legal instruction to
the grand jury"); <u>United States v. Zangger</u>, 848 F.2d 923, 925
(8th Cir. 1988) ("The prosecutor is under no obligation to give
the grand jury legal instructions."); <u>United States v. Kenny</u>, 645
F.2d 1323, 1347 (9th Cir. 1981) (the "indictment is normally
prepared by the prosecutor, who is presumably acquainted with the
'applicable law.'  We are not persuaded that the Constitution
imposes the additional requirement that grand jurors receive
legal instructions").  Thus, even if the prosecutors only read
the relevant statute to the grand jury, defendants still have not
made a sufficient showing for inspection.

        Second, the fact that superseding Indictments were
filed adding allegations of a fiduciary relationship does not
provide evidence that the grand jury was misled.  Defendants cite
no cases for this proposition, and defendants have not provided
any compelling evidence to demonstrate that the grand jury was
misled.

**<u>CONCLUSION</u>**

        For the foregoing reasons, defendants' motion to
dismiss is granted in part and denied in part.  Defendants'

motion to strike certain portions of the Indictment and their

motion to inspect the grand jury's instructions are denied.

SO ORDERED.

Dated:    New York, New York
          October 2, 2006

DENNY CHIN
United States District Judge

## **APPEARANCES**

For the United States:

        MICHAEL J. GARCIA
        United States Attorney for the Southern
         District of New York
           By:  Lauren Goldberg, Esq.
               Anthony Barkow, Esq.
               Andrew L. Fish, Esq.
               Assistant United States Attorneys
        One St. Andrew's Plaza
        New York, NY  10007

For Defendant David Finnerty:

        HAFETZ & NECHELES
           By:  Frederick P. Hafetz, Esq.
               Tracy E. Sivitz, Esq.
        500 Fifth Avenue
        New York, NY  10110

For Defendant Thomas J. Murphy, Jr.:

        MORVILLO, ABRAMOWITZ, GRAND, IASON, & SILBERBERG
           By:  Robert G. Morvillo, Esq.
               Christopher J. Morvillo, Esq.
               Gregory Morvillo, Esq.
        565 Fifth Avenue
        New York, NY  10017